# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

ARCH INSURANCE COMPANY,            :          CIVIL ACTION

     Plaintiff,                   :

          v.                        :

DOUGLAS ASPHALT COMPANY, JOEL:
SPIVEY and KYLE SPIVEY,
                            :

     Defendants.

                            :          No. CV507-038

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above-captioned case arises out of a General Agreement of Indemnity (hereinafter "indemnity agreement") entered into between Plaintiff Arch Insurance Company (hereinafter "Arch") and Defendants Douglas Asphalt Company (hereinafter "Douglas"), Joel Spivey and Kyle Spivey (collectively "Indemnitors"). Arch claims that it is owed $88,892,128.15 by Indemnitors for losses incurred as a result of having issued bonds on behalf of Douglas and that it is entitled to specific performance of the collateral deposit clause of the indemnity agreement and the immediate deposit of an additional $40,000,000.00 in collateral. Defendants, on the other hand, assert that Arch performed its underlying bond

obligations in bad faith, thereby relieving Defendants of their obligations under the indemnity agreement.

The Court conducted a bench trial on Arch's claims for indemnification on February 23 through 26, 2009. Prior to trial, the parties entered into a number of stipulations of fact that were admitted as evidence in the trial. Doc. No. 53. Attachment "A". After hearing witness testimony and considering the evidence tendered, including these stipulations, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.  On or about June 30, 2003, Indemnitors executed the indemnity agreement in favor of Arch. Stipulation 1. The indemnity agreement is valid and enforceable. Stipulation 2.

2.  Pursuant to Paragraph 1 of the indemnity agreement, Indemnitors agreed to:

    > . . . [I]ndemnify and hold harmless Surety for any and all Loss sustained or incurred by reason of having executed any and all Bonds. The Indemnitors obligation to indemnify the Surety shall also apply to all Bond renewals, continuations or substitutes therefore. In the

event of payments by Surety, Indemnitors agree to accept the voucher or other evidence of such payments as prima facie evidence of the fact and extent of the liability of Indemnitors to Surety in any demand, claim or suit by Surety against Indemnitors . . . .

Stipulation 39.

3.    Pursuant to the indemnity agreement, in the event of a default on any single project, Indemnitors assigned to Arch all of their rights under all bonded contracts, including their right to any contract balances that were due or to become due under all of the bonded contracts at or after the time of default and all machinery, equipment, tools and materials which were on the site for use on the bonded contracts.  Indemnity Agreement, ¶ 7. Plaintiff's Exhibit 1.  "Default" is defined in the indemnity agreement as "[a]n instance or condition in which Principal or Indemnitors, or any of them . . . be declared in default on any Bonded Contract" or "neglect or refuse to pay for any labor or materials used in the prosecution of a Bonded Contract."  Id. ¶ "Default".

4.    Also pursuant to the indemnity agreement, in the event of a default, Arch had "the right, but not the obligation, to take possession of the work under any and all Bonded Contracts, and complete or consent to the completion of

-3-

such Bonded Contracts at the expense of the Indemnitors."

Id. ¶ 6.

5.   The indemnity agreement also provides:

> Surety shall have the exclusive right to decide
> and determine whether any claim, liability, suit
> or judgment made or brought against Surety on
> any  Bond  shall  or  shall  not  be  paid,
> compromised,  resisted,  defended,  tried  or
> appealed, and Surety's decision thereon shall be
> final and binding upon the Indemnitors.  Subject
> to the Surety's rights set forth in the first
> sentence of this section, which shall remain in
> full  force  and  effect,  if  Principal  or
> Indemnitors desire that the Surety litigate such
> claim or demand, or defend such suit, or appeal
> from such judgment, they shall deposit with the
> Surety, at the time of such request, cash or
> collateral satisfactory to the Surety in kind
> and amount to be used in paying any judgment or
> judgments rendered, or which might be rendered,
> against  the  Surety,  together  with  interest,
> costs and attorneys fees.

Id. ¶ 5.

6.   Finally, pursuant to the indemnity agreement, Indemnitors

agreed that "[i]f Surety shall set up a reserve to cover

any actual or potential Loss, the Indemnitors will,

immediately upon demand by Surety, deposit with Surety,

a sum of money equal to such reserve to be used, at the

option of the Surety, to pay the Loss or to be held as

collateral security for the Indemnitors' obligations

hereunder."  Id. ¶ 4.

7.  Between 2003 and 2006, at the request of Douglas, Arch issued performance and payment bonds on 200 construction projects, many of which were for projects for the Georgia Department of Transportation (hereinafter "GDOT"). Stipulation 3.

8.  On August 1, 2006, GDOT declared Douglas in default on the Bacon-Ware Counties Project, BR-0001-00(219) 01 & EDS-545(33) 01, the Appling-Wayne Counties Project, GIP-341(39) 01 & BRN-008-11(65) 01, and the Appling County Project, GIP-341(40) 01, referred to collectively as the "Southern Triangle" projects. Stipulations 4,5 & 6.  All of these projects were bonded by Arch.  Stipulation 3; Testimony of Gail Latham.

9.  After these defaults were declared, in October and November 2006, Carl Castellano, Arch's Vice President, traveled to Georgia to meet with Joel Spivey. Stipulation 8; Testimony of Carl Castellano.  The purpose of these meetings was to discuss Douglas' financial status and the possibility of Arch financing Douglas' completion of the Arch-bonded projects.  Id.  Joel Spivey traveled to Philadelphia in December 2006 to meet with Arch representatives concerning the same topics.  Id.

10.  Subsequent to these meetings, Arch and Indemnitors entered into an agreement under which Douglas assigned to Arch any and all bonded contract funds. Exhibit "D" to Plaintiff's Exhibit 3; Testimony of Liz Spiker; Latham Testimony. The agreement also called for the establishment of a joint bank account, into which the bonded contract funds would be deposited. Id. The joint account was opened with The Bank of Tampa on October 27, 2006. Plaintiff's Exhibit 201; Spiker Testimony; Latham Testimony.

11.  Between November 2006 and February 2007, as Arch received funds from GDOT for the defaulted Bacon-Ware, Appling, and Appling-Wayne projects, it deposited these funds into the Bank of Tampa joint account. Spiker Testimony; Latham Testimony. Douglas was notified of all the funds received and deposited by Arch. Spiker Testimony. Between November 2006 and January 2007, the only funds that were deposited into the joint account were all of the funds that Arch received from the defaulted Bacon-Ware, Appling, and Appling-Wayne projects. Id. However, beginning in January 2007, funds from other Arch-bonded

-6-

projects were deposited into the joint account as well.
_Id._

12. After the joint account was established, Douglas advised
Arch of the subcontractors and suppliers that needed to
be paid out of the joint account funds, and would provide
documentation to support those payments. Spiker
Testimony; Latham Testimony. Checks were then prepared
with one signature on behalf of Arch, and sent to Douglas
to obtain the second required signature. Spiker
Testimony. Kyle Spivey signed most of the checks that
were issued out of the joint account between November
2006 and February 1, 2007. _Id._; Plaintiff's Exhibit 6.
All of the checks sent to the Bank of Tampa for payment
to third parties contained two signatures. Spiker
Testimony.

13. During this time, Douglas also requested that Arch make
payments to Martin Marietta, Douglas' aggregate supplier,
in order to ensure the continued delivery and supply of
aggregate for use in paving the various Arch-bonded
projects. Spiker Testimony; Latham Testimony. Between
November 2006 and February 2007, Arch wired $3,590,788.05
to Martin Marietta to pay for past due invoices for

-7-

aggregate that had been supplied to Douglas. Plaintiff's Exhibit 8.

14. Also during this time, Arch requested that Douglas sign Letters of Direction and Voluntary Letters of Default for all Arch-bonded projects. Spiker Testimony; Latham Testimony. Douglas did so at Arch's request. Spiker Testimony.

15. Douglas continued to work on all Arch-bonded projects through February 2, 2007, and continued to receive the contract funds for all Arch-bonded projects, other than those funds received by Arch on the defaulted Bacon-Ware, Appling, and Appling-Wayne projects through January 2007, which were deposited into the joint account. Latham Testimony; Spiker Testimony. During this time, however, liquidated damages were being assessed against Douglas, not only on the Bacon-Ware, Appling, and Appling-Wayne projects, but on a number of Arch-bonded projects due to Douglas' failure to timely complete those projects. Plaintiffs' Exhibits 191, 192, and 194; Latham Testimony; Testimony of Dan Rosis.

16. Around this time, Arch engaged the services of Forcon International (hereinafter "Forcon"), a construction

-8-

consulting company, to assist Arch in its investigation of both the financial condition of Douglas, as well as the status of construction on all Arch-bonded projects. Spiker Testimony; Latham Testimony; Rosis Testimony; Testimony of Mike Sugar. Forcon consultants visited the Bacon-Ware, Appling, and Appling-Wayne job sites, spoke with representatives of the projects' owners, reviewed Douglas' job records and assessed the status of completion, the amount of work being performed by Douglas, the amount paid to date and the estimated amount of work remaining to be completed. Sugar Testimony; Rosis Testimony.

17. During Arch's investigation, it requested plans from Douglas to show that Douglas could complete the Bacon-Ware, Appling, and Appling-Wayne projects, as well as personal financial information from Joel and Kyle Spivey. Latham Testimony; Castellano Testimony. Despite these requests, Indemnitors did not produce any information to show that Douglas was capable of completing the Bacon-Ware, Appling and Appling-Wayne projects, and failed to show Arch how Arch was to be collateralized if it agreed

-9-

to provide assistance to Douglas for that completion. _Id._

18. In January 2007, GDOT declared Douglas in default on another seven projects: Burke County Project EDS-565(8)01, Burke County Project EDS-565(12)01, Turner County Project CSNHS-0006-00(016)01, Jenkins County Project EDS-555(4)01, Brantley County Project CSSTP-M003-00(142)01, Liberty County Project CSSTP-M003-00(318) & (319)01, and the Bulloch County Project STP-068-1(36)LP. Stipulations 10, 11, 12, 13, 15, 16, 17.  All of these projects were bonded by Arch.  Stipulation 3.

19. Beginning in January 2007, Douglas informed Arch that it was having problems funding its payroll needs.  Spiker Testimony.  In response, between January 11, 2007 and February 15, 2007, Arch wired $1,237,124.25 directly to Douglas to pay 75% of its payroll for those weeks as Arch had determined that approximately 75% of the work that Douglas was doing was on Arch-bonded projects.  _Id._; Stipulation 14.

20. In light of Douglas' defaults and its inability to pay its bills when they became due, Arch established a reserve of $40,000,000.00. Latham Testimony; Plaintiff's

-10-

Exhibit 315; Stipulation 41.  On January 4, 2007, pursuant to Paragraph 4 of the indemnity agreement, Arch demanded that Indemnitors deposit with it collateral equal to $40,000,000.00 to cover any anticipated loss. Stipulation 41; Plaintiff's Exhibit 315.  Despite this request, Indemnitors never posted any collateral with Arch.  Stipulation 41.

21. Also in January 2007, Arch contacted Anderson Columbia, a large construction company in north Florida, and inquired as to whether Anderson Columbia would be able to complete the Bacon-Ware, Appling and Appling Wayne projects.  Latham Testimony; Rosis Testimony; Castellano Testimony.  Arch also contacted another construction company, RB Baker, to see whether it was able to complete the Burke (8), Burke (12) and Jenkins projects.  <u>Id.</u> Both Anderson Columbia and RB Baker were Arch accounts, and Arch believed that they would give Arch favorable proposals with reasonable prices for the completion of the projects.  Latham Testimony.  Ultimately, after GDOT declared Douglas in default on the Turner County project, Anderson Columbia was asked to consider providing a

proposal to complete that project, as well.   Rosis
Testimony; Castellano Testimony.

22. Joel Spivey was advised of the meetings that Arch
representatives scheduled with Anderson Columbia and RB
Baker and was invited to attend.   Plaintiff's Exhibits
301 & 308; Castellano Testimony.   Despite this
invitation, nobody from Douglas attended the meetings
between Arch and Anderson Columbia and RB Baker.
Castellano Testimony.

23. Between November 1, 2006 and February 4, 2007, Arch paid
$12,756,982.00 to Douglas' subcontractors and suppliers,
including overhead expenses and payroll, some of which
were not directly connected to Arch-bonded projects.
Exhibit 30; Spiker Testimony.   Arch only recovered
$4,707,047.00 in contract balances.   Id.   Arch made
payments that enabled Douglas to continue to work on all
of its projects, both Arch-bonded and non-Arch-bonded,
while it investigated whether or not Douglas was capable
of completing the Arch-bonded projects.   Latham
Testimony.

24. At the conclusion of its investigation into Douglas'
financial condition and the status of the Arch-bonded

-12-

projects, Arch determined that it would not be feasible to use Douglas to complete the projects. Latham Testimony; Castellano Testimony. On February 1, 2007, Arch sent a letter to Douglas advising it to cease work on all Arch-bonded projects as of February 2, 2007. Latham Testimony; Stipulation 18; Exhibit 358.

25. After Douglas ceased work on the Arch-bonded projects at Arch's direction, Arch took control of the projects, instituted erosion and traffic control maintenance for the projects, notified GDOT and the other owners that it was taking over all Arch-bonded projects, and began the process of assessing the most cost-efficient way in which to resolve or complete the projects. Latham Testimony.

26. After determining that the proposals submitted by Anderson Columbia for the Bacon-Ware, Appling, Applying-Wayne and Turner projects were too high, Arch directed Forcon to solicit competitive bids for the completion of those projects. Latham Testimony; Rosis Testimony; Castellano Testimony. Although the proposals received from RB Baker for the Burke (8), Burke (12), and Jenkins projects were reasonable, RB Baker was not willing to enter into contracts to complete the underlying GDOT

-13-

contracts for those projects and thereafter withdrew its
bids.  Id.  Arch therefore directed Forcon to solicit
competitive bids for those projects as well.  Id.

27. Between February 1, 2007 and April 20, 2007, Douglas was
defaulted on another eighteen Arch-bonded projects and
demands were made upon Arch by the project owners to
complete those projects.  Stipulations 19, 20, 21, 22,
23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 38.
As Arch-bonded projects were declared in default, Forcon
consultants visited the respective job sites, spoke with
the owners' representatives, reviewed Douglas' job
records and the owners' job records, and assessed the
status of completion, the amount paid to date and the
estimated amount of work remaining to be completed for
each project.  Sugar Testimony.

28. Although Arch had received voluntary letters of default
from Douglas on all Arch-bonded projects, see Finding 14
supra, Arch only sent out seven of those letters to
owners on projects that had to be completed and another
twenty-nine projects, most of which were projects on
which only punchlist work remained to be completed.
Exhibit 12; Latham Testimony; Sugar Testimony.

-14-

29. Between January 2007 and October 2007, Arch bid and negotiated completion contracts for nineteen of the defaulted Arch-bonded projects, arranged to buy its bonds back on another ten projects, tendered contractors in return for payment and release of the bonds on another three projects, entered into settlement agreements with Owners regarding the completion of three more projects, worked to finalize the outstanding punchlist and paperwork demands of another ninety projects, and asserted demands and claims against, and negotiated settlements of those claims, with GDOT on seventeen projects. Latham Testimony.

30. By the end of June 2007, Arch had negotiated and received hard bids for the completion of all Arch-bonded projects, even though completion contracts were not formally signed until later. Rosis Testimony; Castellano Testimony.

31. Throughout the trial, representatives from GDOT, Superior Construction, and Nassau County testified that Arch acted timely in completing their projects and that they were satisfied with the timeliness and quality of Arch's response and performance. Testimony of Greg Mayo; Testimony of Pete Kelley; Testimony of David Hallman.

-15-

32.   The Court specifically finds the testimony of Gail
      Latham, Carl Castellano, Liz Spiker, Michael Sugar, and
      Dan Rosis to be particularly credible as it relates to
      the good faith efforts of Arch in dealing with
      Defendants.

33.   Arch incurred losses under the performance bonds it
      issued on behalf of Douglas totaling $156,201,174.69.
      Exhibits 4, 5, & 33-49.  Arch collected contract balances
      from the Owners on the Arch-bonded projects totaling
      $91,821,208.38.   Exhibits 4 & 10.   The $91,821,208.38
      figure includes negotiated concessions received from GDOT
      totaling $21,094,239.00.  Latham Testimony.

34.   Arch also investigated, analyzed, responded to and paid
      over 200 claims against the payment bonds it issued on
      behalf of Douglas.  Spiker Testimony; Latham Testimony.
      Arch's payment bond losses total $23,275,037.59.
      Exhibits 6, 7, 8, 9, 11, and 32; Spiker Testimony.

35.   Adding together Arch's loss of $156,201,174.69 under the
      performance bonds, Arch's loss of $23,275,037.59 under
      the payment bonds, and the $1,237,124.25 that Arch
      advanced for Douglas' payroll, and subtracting the

$91,821,208.38 in recovered contract balances, results in a net loss for Arch of $88,892,128.15.  Exhibit 4.

36.  Arch's losses continue to accrue as defaulted projects continue to be completed.  Rosis Testimony.  The cost to complete those projects will exceed the $40,000,000.00 reserve set by Arch.  Exhibits 33-49.


## CONCLUSIONS OF LAW

1.  The parties agree that the indemnity agreement executed by Indemnitors in favor of Arch is valid and enforceable. Stipulation 2.  Further, this type of agreement has been consistently upheld as valid and enforceable by Georgia courts.  See, e.g., Anderson v. United States Fidelity & Guaranty Co., 267 Ga. App. 624, 627 (2004).  The Court concludes that the indemnity agreement is valid and enforceable.

2.  Under the indemnity agreement, Indemnitors agreed to indemnify Arch for all losses incurred as a result of having issued bonds on behalf of Douglas.  Indemnity Agreement ¶ 1; Stipulation 39.  Under that same provision, in the event of payments by Arch, Indemnitors agreed to accept the voucher or other evidence of such

payments as prima facie evidence of both the fact and extent of Indemnitors' liability.  <u>Id.</u>

3.  Pursuant to the indemnity agreement, upon the declaration of a default on any one of the Arch-bonded projects, Indemnitors assigned all sums due on all bonded contracts over to Arch because Arch then had the right to take possession of the defaulted project as well as all other bonded projects and complete them or arrange to complete them.  Indemnity Agreement, ¶¶ 6 & 7.

4.  Under the indemnity agreement, Arch had the exclusive right to determine which claims against its bonds would be defended, settled or paid and its decisions were binding upon Indemnitors.  Indemnity Agreement ¶ 5. Under Georgia law, "[w]here a decision is left to the discretion of a designated entity, the question is not whether it was in fact erroneous, but whether it was in bad faith, arbitrary or capricious so as to amount to an abuse of discretion."  <u>Nguyen v. Lumbersmens Mut. Cas. Co.</u>, 261 Ga. App. 553, 555 (2003).

5.  Accordingly, once Arch established its prima facie case, the burden then shifted to Indemnitors to prove that Arch exhibited bad faith or an abuse of discretion in paying

-18-

the claims under the performance and payment bonds it issued on behalf of Douglas. <u>Id.</u>; <u>Reliance Ins. Co. v. Romine</u>, 707 F. Supp. 550, 552 (S.D. Ga. 1989).

6. When determining whether Indemnitors are liable to Arch under the indemnity agreement, the Court need only determine whether Arch acted in bad faith or abused its discretion. A finding of mere bad judgment or negligence is not enough. <u>Id.</u> Instead, bad faith "imports a dishonest purpose or some moral obliquity, and [it] implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will." <u>Nguyen</u>, 261 Ga. App. at 555 (quoting <u>Blaney v. O'Heron</u>, 256 Ga. App. 612, 615 (2002)). Accordingly, the question before the Court is not whether Arch was negligent in handling claims under its bonds, but whether it acted in bad faith in handling those claims.

7. Indemnitors have produced no credible evidence showing that Arch acted with an ill will or dishonest purpose in dealing with the defaulted projects or in handling performance or payment bond claims in a timely manner. At most, Defendants have brought forth a very few instances of specific actions by Arch which were less

than perfect.  After personally observing the witnesses, listening to their sworn testimony, and studying thousands of pages of payment records, the Court finds overwhelming evidence of Arch's good faith and no credible evidence of bad faith.

8.   Although, in hindsight, Arch may not have acted flawlessly in each of the thousands of day-to-day decisions and/or payments made, the evidence in no way shows bad faith or an abuse of discretion on the part of Arch.  To the contrary, significant, credible evidence was submitted proving that in some actions, Arch did more than what was required, essentially exhibiting "great faith."

9.   Absent a showing of bad faith or an abuse of discretion on the part of Arch, the language of the indemnity agreement, which the parties have agreed is valid and enforceable, controls the outcome of this case. <u>Reliance Ins. Co.</u>, 707 F. Supp. at 552.

10.  As discussed, Arch incurred losses totaling $88,892,128.15 as a result of having issued bonds on behalf of Douglas.  Under the indemnity agreement, Indemnitors agreed to indemnify Arch for all losses

-20-

incurred as a result of having issued bonds on behalf of Douglas. Indemnity Agreement ¶ 1; Stipulation 39. Therefore, Indemnitors are liable to Arch for $88,892,128.15.

11. Also pursuant to the indemnity agreement, Indemnitors were obligated to, upon Arch's demand, post collateral in an amount equal to the amount of reserve set up by Arch. Indemnity Agreement ¶ 4. As discussed, the evidence shows that Arch established a reserve of $40,000,000.00 and that Arch demanded that Indemnitors deposit with it collateral equal to that amount to cover any anticipated loss. Stipulation 41. Despite this request, Indemnitors never posted any collateral with Arch. Id. Accordingly, Indemnitors' obligation to post $40,000,000.00 in collateral is still outstanding.

**CONCLUSION**

Based on the evidence adduced at trial, Arch is entitled to judgment in its favor and against Defendants, Douglas Asphalt Company, Joel Spivey and Kyle Spivey, jointly and severally, in the amount of $88,892,128.15 plus post-judgment interest. Arch is also entitled to specific performance of

the collateral deposit clause in Paragraph 4 of the indemnity agreement and the immediate deposit of $40,000,000.00 in collateral.

    **SO ORDERED** this <u> 29th </u> day of June, 2009.

    _____
    Judge, United States District Court
    Southern District of Georgia

-22-